## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1) WILLIAM WIMBLEY, | ) | |
| | ) | |
| Plaintiff, | ) | Attorney Lien Claimed |
| | ) | Jury Trial Demanded |
| v. | ) | |
| | ) | Case No.: CIV-25-78-GLJ |
| 1) MCCURTAIN COUNTY JAIL TRUST, | ) | |
| 2) BOARD OF COUNTY COMMISSIONERS | ) | |
| FOR MCCURTAIN COUNTY, | ) | |
| 3) TURN KEY HEALTH CLINICS, LLC , | ) | |
| | ) | |
| | ) | |
| Defendants | ) | |

## COMPLAINT

**COMES NOW**, the Plaintiff, William Wimbley ("Plaintiff" or "Mr. Wimbley"), by and through his attorneys of record, in the above styled case, and for his causes of action against the Defendants, alleges and states as follows:

## PARTIES

1.      Plaintiff is an individual who resides in McCurtain County Oklahoma.

2.      Defendant McCurtain County Jail Trust ("MCJT") is, upon information and belief, a Public Trust, created pursuant to a certain "Trust Indenture" and Oklahoma statutes. The MCJT was at all times pertinent hereto, responsible for creating, adopting, approving, ratifying, and enforcing the rules, regulations, policies, practices, procedures, and/or customs of the McCurtain County Jail ("Jail"), including the policies, practices, procedures, and/or customs that violated Ms. Wimbley's rights as set forth in this Complaint. At all pertinent times, the MCJT was acting under color of State law, as set forth herein.

3.      Defendant Turn Key Health Clinics, LLC ("Turn Key") is an Oklahoma limited liability company doing business in McCurtain County, Oklahoma.  Turn Key is a private

correctional health care company that contracts with counties, including McCurtain County, to provide medical professional staffing, supervision and care in county jails. Turn Key was, at times relevant hereto, responsible, in part, for providing medical services, supervision and medication to Mr. Wimbley while he was in custody at the Jail. Turn Key was additionally responsible, in part, for creating, implementing and maintaining policies, practices and protocols that govern the provision of medical and mental health care to inmates at the Jail, and for training and supervising its employees. Turn Key was endowed by McCurtain County/MCSO with powers or functions governmental in nature, such that Turn Key became an agency or instrumentality of the State and subject to its constitutional limitations.

4.    Defendant Board of County Commissioners for McCurtain County ("Board" or "BOCC") is the legislative entity with non-delegable statutory responsible for providing a jail facility for McCurtain County, Oklahoma that is adequate for the safe-keeping of inmates at the Jail. *See* 57 O.S. § 41. As a matter of Oklahoma law, BOCC exercises the powers of the county. *See* 19 Okla. Stat. § 3. A suit brought against BOCC is the way Oklahoma law contemplates suing the county. *See* 19 Okla. Stat. § 4. BOCC is charged with ensuring that the Jail has adequate funding and resources to provide constitutionally sufficient conditions of confinement.

## JURISDICTION AND VENUE

5.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Eighth and/or Fourteenth Amendments to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

6.    The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Eighth

and/or Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

7.    Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATEMENT OF FACTS

8.    Paragraphs 1-7 are incorporated herein by reference.

■ **Facts Specific to Mr. Wimbley**

9.    Plaintiff was booked into the McCurtain County Jail ("Jail") in or about July 22, 2022. At the time he was booked into the Jail, Mr. Wimbley was 64 years old.

10.    Upon information and belief, at all pertinent times, Mr. Wimbley was a pretrial detainee.

11.    Upon being booked into the Jail, Plaintiff reported that he had a number of pre-existing cardiovascular problems, including chronic hypertension that was worsening as he got older. Plaintiff reported to Jail and Turn Key staff his medical history and that he was prescribed several medications to control his blood pressure and cardiovascular health.

12.    Throughout 2022, Plaintiff made numerous complaints that Jail and Turn Key staff were not properly controlling his blood pressure, but his complaints were largely ignored.

13.    On or around January 7, 2023, Mr. Wimbley complained to a jailer that he had severe chest pain and he believed his hypertension was worsening.

14.    Mr. Wimbley was transported to the McCurtain Memorial Hospital where it was noted that his blood pressure was dangerously high at 226/124, which is undisputably a hypertensive crisis.

15.    Mr. Wimbley was stabilized at the hospital and discharged later on January 7. In the discharge instructions, the physician recommended that the Jail adjust Plaintiff's blood pressure medications to better control his hypertension. The hospital also instructed that Mr. Wimbley was

3

to follow up with a physician within 1-2 days for continuation of care and that he should return to the ER if his symptoms worsened or as needed.

16.     Upon information and belief, both the Jail and Turn Key providers received the discharge instructions.

17.     Once back at the Jail, however, Mr. Wimbley continued to have severe hypertension. Just two days later, on January 9, 2023, Mr. Wimbley again complained of chest pain. His blood pressure was measured at 186/121, another hypertensive crisis.

18.     Jailer Brittany Stockton called Turn Key APRN Becky Pata and notified her of Plaintiff's condition.[1] APRN Pata merely instructed Stockton to give Plaintiff .2mg of Clonidine and to do nothing further.

19.     Contrary to the discharge instructions from January 7, Plaintiff was not seen by a physician and not taken back to the hospital.

20.     Over the next few weeks, Plaintiff's blood pressure was routinely measured at similar levels constituting hypertensive crises. Yet, neither Turn Key providers nor Jail staff took any steps to ensure that Plaintiff: 1) was seen by a physician; 2) was sent back to the hospital; or 3) received any additional or different treatment.

21.     Upon information and belief, Plaintiff suffered from chest pains and severe hypertension on an almost daily basis, yet Jail staff and Turn Key staff failed to take adequate measures to treat his pain, suffering, and serious medical conditions.

---

[1] Upon information and belief, APRN Pata was offsite and did not regularly, if ever, see patients at the Jail. In accordance with longstanding Turn Key policy, practice, or custom, APRN Pata is one of a few "mid-level" providers, such as nurse practitioners or physician's assistants, who cover numerous county jails by giving telephonic instructions regarding patients without ever seeing the patient or even reviewing their records. For more detail, see paragraphs 227-231, *infra.*

22.     Throughout March 2023, Plaintiff's condition significantly worsened. On or around early March 2023, Plaintiff reported to both Jail and Turn Key staff that he'd developed weakness and numbness in his left side, fatigue, and additional pain.

23.      Mr. Wimbley's blood pressure also remained dangerously high and uncontrolled. In deliberate indifference to his serious medical needs, Jail staff and Turn Key staff ignored Plaintiff's complaints, refused to send him to the hospital, failed to have him assessed by a physician, and failed to provide him with any new or different treatment.

24.     Throughout March 2023, Plaintiff pleaded with Turn Key staff and Jail staff on a daily basis to send him to the hospital because his condition was obviously getting worse.

25.     Despite Plaintiff's daily reports that his condition was worsening, neither Jail staff nor Turn Key staff took any steps to address Plaintiff's obviously serious condition. Plaintiff was not seen by a doctor or mid-level provider, was not sent back to the hospital, and did not receive any additional testing or treatment.

26.     Starting around the end of March/ beginning of April 2023, Plaintiff's condition took *another* sharp turn for the worse. He told Jail and Turn Key staff that his left side weakness and numbness had gotten even worse, to the point that he had trouble ambulating. Mr. Wimbley begged Jail staff and Turn Key staff to send him to the hospital. Yet again, however, Jail staff and Turn Key staff failed to take any measures to address Plaintiff's complaints.

27.     On April 5, 2023, Plaintiff's condition had deteriorated to the point that he lost control of his bowels and bladder.

28.     Apparently finally having seen enough, Jail staff and Turn Key staff transported Plaintiff back to McCurtain Memorial Hospital ("MMH"), where it was determined that he had suffered a stroke. Plaintiff subsequently received a medical "OR" or "own recognizance" bond, and he was admitted at the hospital.

29.     After receiving some treatment at MMH, Plaintiff was life-flighted to OU Medical Center for additional treatment.

30.     In late April 2023, Plaintiff was transferred to Valir Rehabilitation Hospital in Oklahoma City where he underwent several grueling weeks of physical therapy in an effort to regain strength and mobility in his left side.

31.     Plaintiff's ongoing pain, suffering, and stroke were directly and proximately caused by Defendants' deliberate indifference and negligence.

- **The Jail's and Turn Key's Policy and Custom of Inadequate Medical Care**

32.     Paragraphs 1-31 are incorporated herein.

33.     There is an affirmative link between the unconstitutional acts and/or omissions of employees or agents of BOCC/MCJT/Turn Key, as described *supra*, and policies, practices and/or customs which the BOCC/MCJT/Turn Key promulgated, created, implemented and/or possessed responsibility for.

34.     To the extent that no single officer violated Mr. Wimbley's constitutional rights, the BOCC/MCJT/Turn Key and Turn Key are still liable under a theory of a systemic failure of medical policies and procedures as described below. There were such gross deficiencies in staffing, facilities, equipment and procedures, at the Jail, that Mr. Wimbley was effectively denied constitutional conditions of confinement.

35.     BOCC/MCJT maintained a policy or custom of insufficient medical staffing, resources, and training, chronic delays in care and indifference toward medical needs at the McCurtain County Jail.

36.     At all pertinent times, there was systemic failure of medical policies and procedures at the Jail.

6

37.    At all pertinent times, there were such gross deficiencies in medical staffing, facilities, equipment, and procedures that Mr. Wimbley was effectively denied access to adequate medical care.

38.    As a matter of policy practice and custom, the BOCC/MCJT failed to staff the Jail with qualified professionals, failed to provide reasonable access to a physician and emergent medical care and failed to supervise the Jail's medical delivery system.

39.    BOCC/MCJT's maintenance of an inadequate medical delivery system at the Jail resulted in numerous negative health outcomes for inmates prior to Mr. Wimbley's incarceration.

40.    For example, on December 17, 2020, an inmate named Travienna Edd died at the Jail. Ms. Edd's Estate subsequently filed a lawsuit against MCJT, two jailers, and a Jail nurse, Kerra Bailey, LPN, pursuant to 42 U.S.C. § 1983.

41.    Ms. Edd's Estate reached a settlement with defendants in August 2024.

42.    Ms. Edd was booked into the Jail on or about January 17, 2020.

43.    When Ms. booked into the Jail, she reported to Kerra Bailey, LPN, that she had lung cancer and bone cancer, diabetes, high blood pressure, and was prescribed several medications for her medical issues. She also disclosed that she used a portable oxygen machine to help her breathe.

44.    Throughout 2020, Ms. Edd's condition steadily declined, reaching a crisis point in November 2020. On or about November 18, 2020, Ms. Edd was sent to McCurtain Memorial Hospital after she reported pain all over her body that was so severe she could not stand or walk on her own. Ms. Edd was also found to be incontinent and had urinated and defecated all over herself.

45.    Ms. Edd was stabilized at the hospital and returned to the Jail. However, her condition continued to deteriorate. Shockingly, November 18, 2020 was the last time – prior to

her death on December 7, 2020 – that Ms. Edd was seen by any health care professional with a licensure exceeding that of an LPN.

46.     Another inmate at the Jail, Dianna McKinney, declared, under the penalty of perjury, that: 1) she interacted with Ms. Edd "multiple times each day"; 2) in the weeks leading up to Ms. Edd's death, McKinney witnessed a drastic deterioration in Ms. Edd's condition; 3) during the final three weeks of her life, Ms. Edd was not able to independently move on her own and would often come in and out of consciousness and had limited ability to communicate verbally; 4) it was **obvious that something was seriously wrong with Ms. Edd and that she needed medical attention**; 5) November 17, 2020 was the last time McKinney saw Ms. Edd able to move independently; 6) during the period from November 18 through December 7, the Jail staff was aware that Ms. Edd was unable to get up on her own; 7) Jail staff also knew that Ms. Edd was urinating and defecating on herself, so they placed her in a cell that lacked a functioning toilet; 8) **Ms. Edd's cell was covered in her urine and feces daily**; 9) Ms. Edd repeatedly pleaded for medical attention and asked Jail staff to send her to the hospital; and 10) Jail staff consistently disregarded her pleas and requests.

47.     On December 6, 2020, Jail Detention Officers Tara Hallford and Madison Christopher went to Ms. Edd's cell and found her lying on the floor naked covered in urine and feces. Instead of calling a doctor or seeking *any* medical treatment for Ms. Edd, Hallford and Christopher dragged Ms. Edd into a wheelchair. She was too weak to even hold her head up.

48.     Hallford and Christohper then wheeled Ms. Edd to the shower and rinsed her lifeless body off. They then returned her to an isolation cell and pulled her out of the wheelchair, where she **collapsed in a heap on the cell floor, unable to stand on her own strength.** Christopher and Hallford left Ms. Edd naked and catatonic in the isolation cell.

49.     Ms. Edd was found dead in her cell approximately three hours later.

50.     Prior to Ms. Edd's death, another inmate at the Jail, Darrell Oglesby, died. Mr. Oglesby had sepsis and pneumonia and suffered from obviously serious symptoms, such as severe shortness of breath, but was not emergently taken to the hospital. After a significant delay, Mr. Oglesby was finally taken to the hospital, where he succumbed to the sepsis and pneumonia.

51.     In 2017, the Tenth Circuit Court of Appeals reversed a grant of summary judgment in favor of the Jail Trust, on a claim of deliberate indifference to a serious medical need. *See Rife v. Oklahoma Dep't of Pub. Safety,* 854 F.3d 637, 652-653 (10th Cir. 2017). The Circuit found sufficient evidence that two detention officers at the Jail disregarded an inmate's -- Clyde Rife's -- obvious need for medical attention. *Rife,* 854 F.3d at 652. In particular, the Circuit determined that the two officers failed to seek medical attention for Mr. Rife despite the fact that he was loudly moaning, complaining of pain and visibly disoriented. *Id.* After leaving the Jail, Mr. Rife collapsed due to a traumatic brain injury. *Id.* at 651-653.

52.     On the evening of September 15, 2021, a 19-year-old man named Roper Harris was arrested by Kevin Clardy, who was McCurtain County Sheriff at the time, McCurtain County Sheriff's Office ("MCSO") Deputy Richard Williamson, and MCSO Investigator Alicia Manning.

53.     After Mr. Harris was handcuffed and offering no resistance whatsoever, Sheriff Clardy, Deputy Williamson, and Investigator Manning pushed him down a steep flight of stairs, seriously injuring him.

54.     They then picked Mr. Harris up and, without provocation, violently threw him back down, slamming him face-first into the concrete sidewalk outside his home.

55.     Mr. Harris was then taken to the McCurtain County Jail. Between the evening of September 15, 2021 and Mr. Harris' release the following day at approximately 12:26 p.m., Jail staff used additional excessive force on Mr. Harris, including shooting him in the eye with a pepper ball gun.

56.     Jail staff also encouraged and/or permitted other Jail inmates to physically attack and beat Harris without cause or provocation by Harris.

57.     Mr. Harris was left bloody, bruised, limp, blinded, and barely conscious.

58.     Mr. Harris pleaded for medical attention, but despite his obviously serious condition, he was provided absolutely no medical treatment at the Jail.

59.     Mr. Harris brought claims, pursuant to 42 U.S.C. § 1983, against MCSO and MCJT officials in connection with his treatment on September 15-16, 2021.

60.     Mr. Harris' Amended Complaint, filed on December 5, 2022, brought claims for, *inter alia*, excessive force and denial of adequate medical care. *See Harris v. McCurtain County Jail Trust, et al.*, Case No. 22-CV-187-RAW-KEW (E.D. Okla.) at Doc. No. 41. Mr. Harris' claims against MCJT are still pending.

61.     In or around July 2024, it was revealed that the Department of Justice and Federal Bureau of Investigation were investigating the Jail's treatment of Mr. Harris.

62.     There was significant evidence from the *Edd* case of an utter lack of supervision and leadership at the Jail. For example, Sheriff Clardy, who is Chairman of the Jail Trust board, testified that he did not know whether the Jail had a written medical delivery plan in the fall and winter of 2020.

63.     Further, Chairman Clardy **did not even know whether the Jail Trust had any written medical policies and procedures.**

64.     The *Edd* case also demonstrated that Jail staff were woefully untrained.

65.     For example, Detention Officer Christopher testified that she did not recall being trained on how to identify a medical emergency or when a detention staff had a duty to notify the shift supervisor or nurse of a medical emergency.

66.     More Officer Christopher did not remember *ever* seeing the Jail Trust's complete Policy manual.

67.     Detention Officer Hallford testified that there was no staff with medical training beyond first aid or CPR staffed on the night shift at the Jail.

68.     Additionally, there was abundant evidence that Jail staff, in *Edd*, repeatedly violated the Jail's medical policies.

69.     For instance, evidence and testimony established that no one at the Jail complied with the Jail's Emergency Medical Care Policy[2] as it pertained to Ms. Edd from November 24 through December 7, 2020, when Ms. Edd died.

70.     Testimony in *Edd* also established that the Jail staff failed to comply with the Emergency Medical Care Policy as it pertained to Mr. Oglesby.

71.     In accordance with the Jail's practice or custom, Jail staff plainly failed to comply with the Emergency Medical Care Policy with respect to both Mr. Harris and Mr. Wimbley.

72.     Chairman Clardy further testified that he was not sure if the Jail Trust board took any affirmative steps to determine if any such policies or procedures were being complied with at the Jail and that he did not know of anything the Jail Trust board had done to assure that the Jail Administrator was implementing any medical policies at the Jail.

73.     It is believed that Defendant Turn Key is the largest private medical care provider to county jails in the state.  Turn Key used its political connections to obtain contracts in a number

---

[2] The Jail's Emergency Medical Care Policy required that when confronted with a medical emergency, Jail staff must 1) immediately notify the Ranking Officer on duty and request assistance in administering first aid; and 2) Request the Control Tower Office to call the Facility Nurse, if on the premises…or contact McCurtain County EMS. The Policy defines "medical emergency" as any of the following: 1) severe bleeding; 2) unconsciousness; 3) serious breathing difficulties; 4) head injury; 5) severe burns; 6) severe pain; 7) suicide attempt; 8) sudden onset of bizarre behavior; and 9) health or life threatening situations.

of counties, including Cleveland County, Oklahoma County, Creek County, Tulsa County, Muskogee County, Garfield County, Ottawa County, Pottawatomie County, Mayes County, and McCurtain County. In recent years, Turn Key has rapidly expanded, and is now the medical provider at county jails in Oklahoma, Arkansas, Kansas, Missouri, Colorado, Texas, Louisiana, Montana, and Alabama.

74.    Turn Key has demonstrated, over a period of years, that its medical delivery system and "plan" is dangerously deficient. At least by the time of Mr. Wimbley's incarceration at the Jail, the County/MCJT knew, or should have known, that Turn Key's grossly deficient system and "plan" posed excessive risks to the health and safety of inmates, like Mr. Wimbley, who suffer from serious and complex medical conditions.

75.    To achieve net profits, Turn Key implemented policies, procedures, customs, or practices to reduce the cost of providing medical and mental health care service in a manner that would maintain or increase its profit margin.

76.    Upon information and belief, under the Contract in effect while Mr. Wimbley was housed at the Jail, Turn Key was responsible to pay the costs of all pharmaceuticals at the Jail up to a set amount per year (both prescription and over-the-counter). If the annual pharmaceutical costs exceeded this limit, MCJT/McCurtain County was responsible for the excess costs.

77.    Similarly, Turn Key was responsible to pay the costs for all off-site medical services and hospitalizations up to a set amount per year, and MCJT/McCurtain County was responsible for any excess costs of inmate hospitalizations and off-site medical care.

78.    The Contract provided that Turn Key will arrange and bear the cost of hospitalization of inmates who – in the opinion of the Turn Key treating physician or medical director, require hospitalization – up to the agreed-upon limit.

79.     These contractual provisions create a dual financial incentive to under-prescribe and under-administer medications and to keep inmates, even inmates with serious medical needs, at the Jail and to avoid off-site medical costs.

80.     These financial incentives create risks to the health and safety of inmates like Mr. Wimbley who have complex and serious medical and mental health needs, such as heart disease and blood clotting disorders.

81.     Turn Key provides inadequate guidance, training and supervision to its medical staff regarding the appropriate standards of care with respect to inmates with complex or serious medical and/or mental health needs.

82.     Specifically, Turn Key has an established practice of failing to adequately assess and treat -- and ignoring and disregarding -- obvious or known symptoms of emergent and life-threatening conditions.

83.     These failures stem from the chronic unavailability of an on-site physician, financial incentives to avoid the costs of inmate prescription medications and off-site treatment and a failure to train and supervise medical staff in the assessment and care of inmates with complex or serious medical needs, such as bipolar disorder, schizophrenia, catatonia, dehydration, malnutrition, hyperthyroidism, and heart disease.

84.     Decisions related to the assessment and treatment of Mr. Wimbley were largely made by LPNs who failed to refer Mr. Wimbley to a physician or offsite medical provider for a medical assessment.

85.     Indeed, upon information and belief, Mr. Wimbley was never medically assessed by a physician, PA, NP, or even RN after January 2023.

86.     Mr. Wimbley was also not provided with medications to adequately address his chronic hypertension and cardiovascular issues.

87.    Additionally, Turn Key has an established practice of failing to adequately assess inmates with complex and serious medical and mental health needs, including a failure to regularly take vital signs. Upon information and belief, Mr. Wimbley' vitals were rarely taken after March 15, 2023, despite his rapidly deteriorating condition.

88.    Even on the rare occasions Turn Key staff takes vital signs from inmates with complex and serious medical and mental health needs, like Mr. Wimbley, Turn Key has an established practice of failing to train medical and mental health staff on what constitutes alarming vital signs; when to report alarming vital signs to a physician; and failing to send inmates with complex and serious medical and mental health needs to an outside medical facility for an adequate assessment and treatment.

89.    Turn Key's inadequate or non-existent policies and customs were a moving force behind the constitutional violations and injuries alleged herein.

90.    Turn Key's corporate policies, practices, and customs, as described *supra*, have resulted in deaths or negative medical outcomes in numerous cases, in addition to Mr. Wimbley.

91.    In November 2014, while detained at the Cleveland County Jail, Robert Allen Autry developed a sinus infection. Both he and his mother informed Turn Key medical staff that a traumatic brain injury he suffered as a teenager made him particularly susceptible to sinus infections causing life threatening brain injections. Mr. Autry and his mother repeatedly asked medical staff to provide antibiotics, but none were provided.

92.    Approximately two weeks after she initially contacted medical staff about her son's condition and need for care, Turn Key staff called Mr. Autry's mother asking her to provide written consent for Mr. Autry to receive emergency surgery.

93.    He had been found unconscious in his cell and had been transported to the hospital. Later the same day, Mr. Autry was diagnosed with "a serious bacterial infection in his brain as a

14

result of an untreated sinus infection." Mr. Autry underwent emergency brain surgery and subsequently a serious of other operations and procedures to place a feeding tube, insert a tracheal tube, and replace a cranial monitoring probe.

94.     Eventually, the treating physician determined Mr. Autry "was totally incapacitated from a brain injury resulting from a brain abscess and subdural empyema" and "would likely never return to an independent state."

95.     In June 2016, a nurse who worked for Turn Key at the Garfield County Jail allegedly did nothing to intervene while a hallucinating man was kept in a restraint chair for more than 48 hours. That man, Anthony Huff, ultimately died restrained in the chair.

96.     On September 24, 2017, a 25-year-old man named Caleb Lee died in the Tulsa County Jail after Turn Key medical staff, in deliberate indifference to Mr. Lee's serious medical needs, provided nearly nonexistent treatment to Mr. Lee over a period of 16 days. Mr. Lee was not seen by a physician in the final six (6) days of his life at the Tulsa County Jail (and only once by a psychologist during his entire stay at the jail), despite the fact that other Turn Key staff noted that he was suffering from: tachycardia, visible tremors, psychosis, symptoms of delirium, stage 2 hypertension, paranoia, and hallucinations. Turn Key staff failed to transfer Mr. Lee to an outside medical provider despite these obviously serious symptoms that worsened by the day until Mr. Lee's death on September 24, 2017.

97.     An El Reno man died in 2016 after being found naked, unconscious and covered in his own waste in a cell at the Canadian County Detention Center, while ostensibly under the care of Turn Key medical staff. The Office of the Chief Medical Examiner found the man had experienced a seizure in the days before his death.

98.     Another man, Michael Edwin Smith, encountered deliberate indifference to his serious medical needs at the Muskogee County Jail in the summer of 2016. Mr. Smith became

permanently paralyzed when the jail staff failed to provide him medical treatment after he repeatedly complained of severe pain in his back and chest, as well as numbness and tingling. Smith claims that cancer spread to his spine, causing a dangerous spinal compression, a condition that can cause permanent paralysis if left untreated. Smith asserts that he told the Turn Key-employed physician at the jail that he was paralyzed, but the physician laughed at Smith and told him he was faking. For a week before he was able to bond out of the jail, Smith was kept in an isolation cell on his back, paralyzed, unable to walk, bathe himself or use the bathroom on his own. He was forced to lay in his own urine and feces because staff told Smith he was faking paralysis and refused to help him.

99.    In November of 2016, Turn Key staff disregarded, for days, the complaints and medical history of James Douglas Buchanan while he was an inmate in the Muskogee County Jail. As noted by Clinton Baird, M.D., a spinal surgeon:

> [Mr. Buchanan] is a 54-year-old gentleman who had a very complicated history… [H]e was involved in being struck by a car while riding bicycle several weeks ago. … **He ended up finding himself in jail and it was during this time in jail that he had very significant clinical deterioration in his neurologic status. [I]t is obvious that he likely developed the beginnings of cervical epidural abscess infection** in result of his critical illness [and] hospitalization, but then **while in jail, he deteriorated significantly and his clinical deterioration went unrecognized and untreated** until he was nearly completely quadriplegic.

100.    On September 24, 2017, a 25-year-old man named Caleb Lee died in the Tulsa County Jail after Turn Key medical staff, in deliberate indifference to Mr. Lee's serious medical needs, provided nearly nonexistent treatment to Mr. Lee over a period of 16 days. Mr. Lee was not seen by a physician in the final six (6) days of his life at the Tulsa County Jail (and only once by a psychologist during his entire stay at the jail), despite the fact that other Turn Key staff noted that he was suffering from: tachycardia, visible tremors, psychosis, symptoms of delirium, stage 2

hypertension, paranoia, and hallucinations. Turn Key staff failed to transfer Mr. Lee to an outside medical provider despite these obviously serious symptoms that worsened by the day until Mr. Lee's death on September 24, 2017.

101.    Like Mr. Wimbley, Mr. Lee was largely assessed and treated by LPNs during his nearly three-week incarceration at the Jail before his death.

102.    Indeed, a physician never once saw Mr. Lee for a week before his death, despite the fact that his symptoms and conditions, including hypertension, bipolar disorder, and hallucinations, continued to deteriorate.

103.    In January 2018, Marconia Kessee died of drug toxicity in the Cleveland County Jail after Turn Key wholly failed to take any actions – including performing a medical intake evaluation – in response to profuse sweating, inability to walk, incoherent speech, and seizure-like convulsions of Mr. Kessee and instead put him in a cell where he died within hours. Cleveland County Jail jailers were aware of the same symptoms and performed wholly inadequate, less than one second long sight checks of Mr. Kessee throughout the last hours of his life. Turn Key staff did not even perform a single sight check of Mr. Kessee during the time he lay dying, until he was found completely unresponsive.

104.    On September 6, 2019, Dunniven Phelps was booked in to the Tulsa County Jail.

105.    During the book-in process, on September 6 at approximately 7:35 p.m., Turn Key employee/agent Richard Dutra filled out an Intake Screening form.  Pertinently, the Intake Screening form indicates that Mr. Phelps was being treated for hypertension (high blood pressure) at the time and had been prescribed medication by his physician to treat the condition.  During the intake screening process, Mr. Dutra further documented that Mr. Phelps was diabetic and had previously been diagnosed with mental health conditions.

106.    During the medical intake process, Mr. Phelps complained that he had a severe headache, neck pain, and burry vision, which are common symptoms of a stroke.

107.    Despite the fact that Mr. Phelps told Mr. Dutra about his current symptoms and history of hypertension, Mr. Dutra recommended that Mr. Phelps be placed in general population and that he did not need a referral for a continuity of care plan.

108.    Throughout the night of September 6, 2019, Mr. Phelps' symptoms significantly worsened, as he was obviously suffering from a stroke.

109.    By the morning of September 7, Mr. Phelps was experiencing severe weakness on the entire left side of his body, leaving him barely able to walk, as his left leg was almost completely numb.

110.    At approximately 9:37 a.m. on September 7, Turn Key Nurse Patty Buchanan "assessed" Mr. Phelps, who told her that he could hardly feel or move the left side of his body and his other symptoms, such as dizziness and blurred vision, were worsening. Nurse Buchanan recorded Mr. Phelps' blood pressure as 163/103, which the American Heart Association classifies as Stage 2 hypertension.

111.    Nurse Buchanan failed to inform a physician or even an RN or Nurse Practitioner about Mr. Phelps' alarming symptoms and worsening condition, in deliberate indifference to his serious medical needs.

112.    Further, while Nurse Buchanan allegedly counseled Mr. Phelps on the importance of taking his medications, there is no evidence that she, or anyone else at TCSO/Turn Key, ***ever gave Mr. Phelps any medications during his time at the Jail.***

113.    On one occasion, when Mr. Phelps could not get off of the ground because he could not use his left leg or left arm, a DO threatened to "Taze" Mr. Phelps if he didn't get off the ground.

18

114.    Mercifully, an inmate who was an amputee let Mr. Phelps use his wheelchair so that he could try to get an actual medical assessment and treatment at the medical unit of the Jail.

115.    At approximately 2:19 p.m. on September 7, a DO finally agreed to wheel Mr. Phelps to the medical unit, where he was seen by Nurse Gann.

116.    Shockingly, Nurse Gann thought Mr. Phelps was faking his emergent condition. Jail surveillance video shows Mr. Phelps lying on the ground in the medical unit, unable to walk, stand, or effectively use his arms, while Nurse Gann drops a piece of paper onto his face, presumably because she thought Mr. Phelps would move out of the way if he was capable of moving. Nurse Gann and other Turn Key personnel left Mr. Phelps lying on the floor, helpless and in immeasurable pain.

117.    At 4:05 p.m. on September 7, Mr. Phelps was finally seen by Elizabeth Martin, Advanced Practical Registered Nurse ("APRN").

118.    APRN Martin noted that Plaintiff had a ***3 day history of evolving stroke like symptoms.*** She also noted that Plaintiff's "speech [was] slurred" and that he had "left side facial droop" and weakness on his left side. By this time, Plaintiff's blood pressure was 183/114, which is considered a ***hypertensive crisis that requires immediate consultation and assessment by a physician.***

119.    Mr. Phelps was finally sent to Hillcrest Medical Center at approximately 6:15 p.m. on September 7, 2019.

120.    Once at Hillcrest, Mr. Phelps was transferred to the Intensive Care Unit ("ICU") where physicians provided emergent, live-saving treatment.

121.    Unfortunately, the delay in treating Mr. Phelps, due to Turn Key and Jail staff's deliberate indifference, resulted in Mr. Phelps suffering permanent damage.

122.    Mr. Phelps is now permanently paralyzed on the entire left side of his body and will require significant medical treatment for the rest of his life.

123.    From June to October 2019, Bryan Davenport, an inmate at the Cleveland County Jail, was denied adequate medical care by Turn Key personnel. Mr. Davenport informed Turn Key staff that he had hypertension and HIV, yet he was not seen by a physician, physician's assistant, or nurse practitioner for nearly a month after his arrival at the jail. Davenport provided Turn Key staff with the names of his providers, his need for HIV medications, and the names of those medications. When a Turn Key nurse finally saw Davenport, she told him that she did not want to start treatment pertaining to his HIV and left him without vital medications for several months. Turn Key also refused to treat Davenport under their "chronic care" protocol, instead requiring him to submit multiple sick calls just to attempt to get his medications so that Turn Key and Cleveland County could charge Davenport $15/visit.

124.    In October-November 2020, an inmate at the Cleveland County Jail slowly died of his known congestive heart failure as Turn Key and its employees ignored the obvious and severe worsening of his condition, including extreme edema and swelling, fluid leaking from his legs, urinary incontinence, and clear sings of infection. Turn Key staff failed to properly assess, evaluate, or treat the inmate and failed to refer him to a more highly trained provider or an outside medical provider.

125.    In July 2021, an inmate named Perish White died of COVID-19, which he contracted in the Creek County Jail.

126.    Mr. White began feeling ill on or about July 5, 2021, and reported his symptoms to Turn Key staff at the Creek County Jail.

127.    By July 8, 2021, at the latest, Mr. White began experiencing shortness of breath and coughing. On information and belief, Mr. White also stopped eating and was refusing meal trays.

These drastic changes in Parish's condition, particularly in light of the ongoing COVID-19 pandemic, made it obvious, even to a layperson, that Perish needed emergent evaluation and treatment from a physician.

128. ***From July 5 to July 16, 2021, Turn Key staff never once took Mr. White's vital signs,*** despite his repeated complaints that he was seriously ill, his obvious symptoms, and the fact that COVID-19 was raging through the Creek County Jail.

129. On July 19, 2021, Mr. White was finally taken to OSU Medical Center in Tulsa for COVID-19 and respiratory failure. At the time, his oxygen saturation level was in the 70's. He was diagnosed with acute kidney failure. He was placed on life support, including a ventilator and dialysis.

130. Mr. White died on July 30, 2022.

131. April 13, 2021, Christa Sullivan died at the Oklahoma County Jail ("OCJ"), which also uses Turn Key as its jail medical provider.

132. Ms. Sullivan had a history of severe mental illness, including depression, bipolar disorder, schizophrenia, and several previous suicide attempts.

133. Ms. Sullivan was housed at the OCJ for nearly a year prior to her death. Throughout her time at OCJ, she exhibited extremely serious symptoms, including multiple instances of self-harm, suicidal ideation, a refusal to eat or drink, rapid weight loss, and catatonia.

134. Approximately two months before Ms. Sullivan's death, numerous Turn Key providers, including nurses and two physicians, acknowledged Ms. Sullivan's emergent conditions and the fact that it was impossible for Ms. Sullivan to receive the life-saving care she needed in a jail setting.

135. In fact, one Turn Key physician noted, with respect to Ms. Sullivan:

***DEPRESSED AFFECT, SEVERE ADULT FAILURE TO THRIVE. SEEMS AT HIGH RISK FOR POOR OUTCOME. I HAVE DISCUSSED HER CASE WITH PSYCHE, NURSING, AND WOUND CARE AND DO NOT SEE ANY LIKELY TO SUCCEED INTERVENTIONS IN THIS SETTING. SHE DOES NOT SEEM COMPETENT BY ANY BEHAVIORAL PARAMETER THAT I CAN SEE. WILL REDISCUSS OPTIONS WITH DR. CUKA AND DR. COOPER.***

136. Yet, Turn Key providers allowed Ms. Sullivan to languish in her cell for months, cationic and barely eating, until her eventual death.

137. After Ms. Sullivan's death, Kevin Wagner, a Captain at OCJ told an investigator, "[Ms. Sullivan] went from 148 when she got here to … ***she looks like a skeleton.***" Captain Wagner also told the investigator he helped get Ms. Sullivan to a local hospital for a week at one point "because I felt that ***medical (in the Jail) wasn't providing her care enough.***"

138. Another staff member told an investigator that Ms. Sullivan deteriorated ***"to a bag of bones."***

139. On June 12, 2021, Joseph Stewart was booked into the Cleveland County Jail.

140. On June 13, 2021, Mr. Stewart advised a Jail detention officer and Turn Key Nurse Angela Albertson, LPN, that he needed to go to the hospital because his arm had been hurting since the day of his arrest and because he had an L1 (lumbar vertebrae) fracture that was hurting.

141. Responsible Jail and Jail medical staff did nothing other than instruct Mr. Stewart to "not lay on his right side and rest arm."

142. Two hours later, Mr. Stewart advised Turn Key Nurse Sarah Garcia, LVN, of his arm and back pain.

143. In response, Mr. Stewart was moved to a bottom bunk. Nurse Garcia did not alert any other medical provider of Mr. Stewart's condition, complaints, or her decision making.

22

144.    On June 17, 2021, Nurse Albertson responded to a sick call placed by Mr. Stewart. Nurse Albertson noted that Mr. Stewart had increased pain and reduced range of motion in his left arm and a belief that it might be associated with his back.

145.    On June 19, 2021, Turn Key LPN Amanda Stehr observed Mr. Stewart "laying on the …floor" in distress with a pain rating of 10/10. She charted that Mr. Stewart asked "multiple times" to be transported to the hospital, that he was experiencing the worst pain he had ever been in and he could not handle it."

146.    In response, Nurse Stehr called a Turn Key NP, ***whose only action was to prescribe an 800 mg ibuprofen, despite Mr. Stewart's obviously serious – and steadily worsening – symptoms and condition***.

147.    On June 21, 2021, Turn Key CRNP Becky Pata was informed that Mr. Stewart had fractured his L1 approximately three months previous, that he had experienced right shoulder pain since booking, and that he had a history of herniated discs.

148.    Pata observed Mr. Stewart limping and "obviously in a great deal of pain" before charting that she would "send to ER out of abundance of caution."

149.    After being transported to Norman Regional Hospital ("NRH"), Mr. Stewart's L1 compression fracture was confirmed.

150.    Mr. Stewart was returned to the Jail after his short visit to the NRH ER.

151.    On June 30, 2021, Mr. Stewart reported to Pata that he didn't feel well. He was taken back to NRH to be evaluated for pneumonia. Mr. Stewart reported symptoms including shortness of breath and unilateral leg swelling for the past month. After treating and discharging Mr. Stewart, NRH provided discharge instructions to the Jail and Turn Key that Mr. Stewart needed to return to the hospital in the event of "worsening symptoms or any symptoms of concern," "trouble breathing," or any "new symptoms or other concerns."

152.    On July 4, 2021, Mr. Stewart reported the following worsening or new conditions to Defendant Nurse Kariuki: 1) chest pain of 10/10; and 2) spitting up blood. Nurse Kariuki observed that Mr. Stewart appeared to be in distress with "reddish-green mucous…in the toilet."

153.    In response to these alarming (and new) symptoms, Kariuki did nothing other than click a preformatted box suggesting that she instructed him to "increase fluids, medication use, follow-up sick call if no improvement."

154.    Upon information and belief, Nurse Kariuki failed to report these symptoms to a physician, NP, PA, or RN, despite being aware of NRH's discharge instructions.

155.    On July 5, 2021, Mr. Stewart reported to Nurse Albertson additional worsening or new conditions, including difficulty breathing and persistent coughing.

156.    In response to these new symptoms/worsening condition, Nurse Albertson did nothing other than instruct Mr. Stewart to "take good deep breaths so as not to get pneumonia."

157.    On July 7, 2021, Mr. Stewart reported to CRNP Pata that he now was coughing up blood streaked sputum and had heartburn.

158.    Pata, despite having knowledge of the NRH discharge instructions, did not contact a physician or the hospital and merely ordered omeprazole and prednisone for Mr. Stewart.

159.    On July 14, 2021, Mr. Stewart reported the following worsening or new conditions to Turn Key LPN Christina Meza: 1) "woke up with blood dripping down the side of my face"; 2) pale-looking appearance; 3) persistent coughing; and 4) "leaning forward to breathe with hands on knees."

160.    Meza did nothing other than order Guaifenesin, a generic cough medicine. She did not report Mr. Stewart's condition to a physician or the hospital despite knowing of NRH's discharge instructions.

161.    Within an hour of Mr. Stewart's complaint to Meza, Turn Key and Jail staff allowed Mr. Stewart's release without disclosing the extent of his medical condition. Mr. Stewart was released to the custody of a deputy from Kingfisher county at approximately 7:59 p.m.

162.    No one informed the Kingfisher deputy of Mr. Stewart's emergent condition or NRH's orders to bring Mr. Stewart back to the hospital if he had new or worsening symptoms.

163.    Upon arrival at the Kingfisher Jail, approximately 60 miles from Norman, the medical staff at the Kingfisher Jail refused to admit Mr. Stewart based on his dire medical condition.

164.    The transporting deputy then took Mr. Stewart to a local hospital before he was transferred to a hospital in Enid where he died the following day, July 15, 2021.

165.    Mr. Stewart died due to acute bacterial endocarditis, acute respiratory failure, congestive heart failure, and hyponatremia.

166.    On August 3, 2021, Gregory Neil Davis was arrested by Oklahoma City Police Department ("OCPD") Officers and transported to the OCJ.

167.    Mr. Davis was charged with indecent exposure, and was observed by officers to be in the midst of an obvious mental health crisis.

168.    Upon arriving at the OCJ, Mr. Davis was not evaluated by Turn Key personnel, nor was he tested for COVID-19 or have his vital signs taken.

169.    Mr. Davis was finally seen by a Turn Key provider, Sanaria Okongor, LPC, on August 6, 2021. Ms. Okongo noted that Mr. Davis suffered from signs of psychosis, but she made no treatment recommendations or took any actions other than to recommend follow-up a few days later.

170. Ms. Okongor saw Mr. Davis again on August 9, 2021 and again noted he appeared to be suffering from psychosis. Ms. Okongor again failed to make any treatment recommendations or take any actions, including taking vital signs or referring Mr. Davis to a higher-level provider.

171. For at least the final few days of Mr. Davis's life – from August 9-12, 2021 – inmates in nearby cells heard Mr. Davis beating at his cell door, crying, and begging for medical help but no one came to assist him, provide him medical care, or refer him to a physician or outside medical provider.

172. On the morning of August 12, 2021, at approximately 6:45 a.m., Mr. Davis was observed in his cell in need of emergency medical attention by Lt. Morris and Ronald Anderson, employees and/or agents of the Oklahoma County Criminal Justice Authority ("OCCJA").

173. Upon information and belief, EMSA was not called until approximately 9:17 a.m. When EMSA arrived, paramedics transported Mr. Davis to a nearby hospital, where he was pronounced dead.

174. Mr. Davis died of a perforated duodenal ulcer, a condition that does not normally result in death unless left untreated for a substantial period of time, often more than 24 hours.

175. From August 3-12, 2021, the only Turn Key personnel who saw, evaluated, assessed, or "treated" Mr. Davis was an LPC, who saw Mr. Davis on two occasions.

176. Mr. Davis was never seen by a Turn Key physician nor was he referred to an outside medical provider other than the day of his death, when it was far too late.

177. In August 2021, Larry Price, an intellectually disabled, 55-year-old inmate at the Sebastian County (Arkansas) Adult Detention Center, starved to death after responsible jail and Turn Key personnel failed to properly treat his medical and mental health conditions, including schizophrenia, for a year.

178.    The six foot, two inch Mr. Price entered the jail weighing approximately 185 pounds. By the time he was found unresponsive in his cell 366 days later, he weighed 90 pounds according to EMS reports. He had also been ingesting his own urine and feces according to reports.

179.    The medical examiner's report noted that Mr. Price was COVID-19 positive when he died, but the official cause of death was listed as "acute dehydration and malnutrition."

180.    For over a year, Turn Key personnel watched as Mr. Price deteriorated both physically and mentally, doing nothing to assess, evaluate, or treat his conditions. Nor did Turn Key personnel refer Mr. Price to an outside medical provider.

181.    On December 24, 2021, Dean Stith, a 55-year-old man, was booked into the Tulsa County Jail after being arrested for the non-violent misdemeanor of false reporting of a crime.

182.    Mr. Stith suffered from numerous pre-existing medical and mental health conditions, including hypertension, bipolar disorder and/or schizophrenia, and serious dementia, which was obvious even to a layperson. Indeed, upon information and belief, the charges Mr. Stith faced - false reporting of a crime – were the result of symptoms of his dementia.

183.    During the book-in process, on December 25, 2021 at approximately 12:14 a.m., Turn Key employee/agent James Flora, LPN filled out an Intake Screening form.  Pertinently, the Intake Screening form indicates that Mr. Stith: was being treated for hypertension; had an unstable gait; had open sores and wounds on both of his hands; was disheveled, disorderly, and insensible.

184.    Mr. Stith's condition continued to deteriorate throughout his stay at the Jail.

185.    On January 5, 2022, at approximately 4:29 p.m., Turn Key Nurse Practitioner Megan Rasor saw Mr. Stith for the purported purpose of "[hypertension] and wounds to BLE." NP Rasor charted that Mr. Stith was unable to recall his medication regimen and was "A&O [alert

and oriented] to person and place only. Patient **has 2+ pitting edema to BLE with multiple open areas...[3]** Patient to wear compression hose but is noncompliant."

186. On January 7, 2022, Mr. Stith's blood pressure was measured at 101/68, his pulse was 60, which is in the low range. Inexplicably, his oxygen saturation was not taken.

187. Also on January 7, Judy Wagga, a Turn Key Psychiatric Nurse Practitioner, saw Mr. Stith and noted that he "appeared to be responding to internal stimuli." This was a sign that Mr. Stith was suffering from acute psychosis, an emergent situation.

188. On January 8, 2022, Mr. Stith's pulse rose to 98 and his blood pressure rose to 124/97. Yet, despite these fluctuations, Mr. Stith was not put on any blood pressure medicine or given additional treatment.

189. On January 9, 2022, Alicia Irvin, Turn Key psychologist, noted Mr. Stith's dementia and wrote that he had slurred speech, a new alarming symptom, and was not responding appropriately to questions. Dr. Irvin described Mr. Stith as having a "Major Neurocognitive Disorder." But Mr. Stith was not sent to an outside medical provider nor referred to a physician.

190. Mr. Stith's pulse had also plummeted to 56, which is considered bradycardia. Bradycardia can be a serious problem if heart can't pump enough oxygen-rich blood to the body. Symptoms of bradycardia include confusion, such as the confusion repeatedly displayed by Mr. Stith.

191. By this point it was abundantly clear that Mr. Stith was suffering from a condition that could not be adequately treated in a correctional setting. With negligence and deliberate

---

[3]     Pitting edema is when a swollen part of your body has a dimple (or pit) after you press it for a few seconds. It can be a sign of a serious health issue, such as a blood clot, congestive heart failure, kidney disease, liver disease or *lung disease*. Nurse Lewis' note indicates that Mr. Stith had pitting edema in both legs.

indifference, Dr. Irvin, who is not a physician, failed to call for an ambulance or otherwise ensure that Stith was urgently evaluated by a physician.

192.    At approximately 2:46 p.m. on January 9, Turn Key Nurse Sarah Lewis, LPN, observed Mr. Stith **"drooling, tangential thought, not responding appropriately to questions, diminished skin turgor,[4] 2+ pitting edema to BLEs, and full body weakness."** Nurse Lewis also noted that Mr. Stith was **unable to urinate**.

193.    Particularly when coupled with his worsening condition over a period of days, Nurse Lewis' note clearly reflects that Mr. Stith was in a dire condition and in obvious need of emergent care that could not be provided in a correctional setting. Nonetheless, with negligence and deliberate indifference, Nurse Lewis failed to call for an ambulance or even contact a physician.

194.    On January 10, 2022, at approximately 4:05 a.m., Mr. Stith was found wedged between his bunk and the wall in his cell. TCSO Detention Officer Davis notified Turn Key Nurses Nikki Copeland and Sarah Schumacher, who found that Mr. Stith was "cool to the touch and arms contracted to chest."

195.    EMSA was called and paramedics arrived at approximately 4:39 a.m., finding Mr. Stith unresponsive. The EMSA paramedics documented that Jail **"health care staff are poor historians** and are unsure of timeline."

196.    The paramedics noted that Mr. Stith was displaying decorticate posturing, which is a pose in which someone has rigid, extended legs, arms bent toward the center of their body, pointed and turned in toes, curled wrists, and balled hands. Decorticate posturing is caused by abnormal brain conditions such as a stroke, concussion, traumatic brain injury, brain bleed, brain

---

[4]    A decrease in skin turgor is a late sign of dehydration.

tumor, or infection. Mr. Stith was transferred to St. John Medical Center where he presented in cardiac arrest.

197.     Providers at St. John were unable to resuscitate Mr. Stith, who passed away shortly after his arrival.

198.     The Office of the Chief Medical Examiner of Oklahoma determined that Mr. Stith died due to: 1) acute bronchopneumonia[5] due to complications of COVID-19; and 2) hypertensive atherosclerotic cardiovascular disease.

199.     On December 12, 2022, Shannon Hanchett died at the Cleveland County Jail.

200.     Ms. Hanchett was a mother of two boys and a pillar of the local community.  She was the owner of Norman's Cookie Cottage, a well-known and popular bakery in Norman, OK.

201.     Ms. Hanchett had a bachelor's degree and a master's degree in Human Relations from the University of Oklahoma.  She began her career helping children at the Oklahoma Department of Mental Health Services, where she worked for almost a decade advocating for mental health care. Tragically, she would later find herself in the same position as the vulnerable people she had passionately tried to help.

202.     In October of 2022, Ms. Hanchett went to the hospital for severe headaches, but a CT scan found no abnormalities.  A few weeks later, she began to exhibit signs of mental illness consistent with bipolar disorder and/or schizophrenia. She had no prior history of illness

203.     The following month, Ms. Hanchett began to hallucinate and became convinced that her husband of 17 years, Daniel, had tapped the cell phone he had recently bought for her.

204.     On the evening of November 26, 2022, Ms. Hanchett entered an AT&T Wireless store in Norman, hoping to buy a new cell phone.  While in the store, she exhibited obvious signs

---

[5]     Symptoms of bronchopneumonia include muscle aches, confusion or delirium.

of psychosis.

205.    Clearly confused, distressed, and suffering from delusions, Ms. Hanchett asked a store employee to call 911, and a Norman Police Department ("NPD") Officer responded to the scene.

206.    The Officer acknowledged that Ms. Hanchett appeared to be exhibiting behavior consistent with a mental health disorder. Nevertheless, he arrested Ms. Hanchett for misdemeanor obstruction and transported her to the Cleveland County Jail ("Jail"). Video from the officer's body-worn camera shows that Ms. Hanchett is disoriented and terrified at the prospect of being arrested.

207.    Ms. Hanchett had no criminal history. This was her first time in a detention facility. She was a pretrial detainee.

208.    Jail surveillance video shows Ms. Hanchett's mental health status, which could conservatively be described as acute psychosis, continued to deteriorate after arriving at the Jail.

209.    Turn Key nurse Danille Hay, LPN, began the medical intake process with Ms. Hanchett but later claimed she was unable to complete it due to Ms. Hanchett's ongoing and severe mental health crisis.

210.    Nurse Hay *was* able to chart, however, that Ms. Hanchett suffered from lupus and bipolar disorder.

211.    Nurse Hay also took Ms. Hanchett's vital signs. Her blood pressure (143/89) and pulse (120 BPM) were both elevated. Nurse Hay did not, however, take any steps to address these concerning vital signs.

212.    Nurse Hay later charted that Ms. Hanchett had been "uncooperative" during processing and that she'd been unable "to complete [intake] at this time." However, in a written report, Officer David Owen notes that Ms. Hanchett "appears to cooperate with officers while

31

being processed as a new inmate."

213.    After failing to complete the intake process, Jail staff locked Ms. Hanchett in processing cell B130 – a tiny, cockroach-infested cell that had no sink, no toilet and no bed. For the next 11 days, she was confined in these conditions and deprived of virtually all human contact. The lights were left on at all times, day and night, depriving her of any sleep.

214.    For periods of up to 5 days at a time, no one at the Jail even opened the door of Ms. Hanchett's cell. Denied access to a toilet, she was forced to urinate on the floor and then lie in her own waste.

215.    Despite the absence of a sink in her cell, no one at the Jail provided her with water or other hydration, day after day after day.

216.    Throughout this time, the Jail and Turn Key staff were fully aware of Ms. Hanchett's dreadful conditions of confinement and her escalating mental health crisis.

217.    Ms. Hanchett's cell was video monitored, allowing Jail staff to clearly see her extreme distress, her erratic behavior, and the rotting food, trash, and human waste on the floor of her cell. Despite observing that Ms. Hanchett had not been adequately eating and had been given nothing to drink for days, they failed to address these dangerous health risks or report them to a physician. This constitutes deliberate indifference, reckless neglect and inhumane mistreatment across the board. Indeed, Ms. Hanchett was shown *nothing but* indifference during her time at the Cleveland County Jail.

218.    After 12 unspeakably horrific days at the Cleveland County Jail, Ms. Hanchett died.

219.    The Medical Examiner's office determined Ms. Hanchett died of heart failure. Other significant conditions contributing to her death were psychosis with auditory and visual hallucinations and severe dehydration.

220.    On information and belief, Ms. Hanchett's death was would not have occurred in

32

the absence of her prolonged catatonia and severe dehydration.

221.    Ms. Hanchett was just 38 years old when she died.

222.    In December 2022, 25-year-old China Bradley went into cardiac arrest at the Tulsa County Jail. She was transferred to St. John Hospital, but she never regained consciousness.

223.    Ms. Bradley had spent the previous several months at the Tulsa County Jail, ostensibly under the "care" of Turn Key providers. In reality, Turn Key providers repeatedly ignored Ms. Bradley's obviously serious medical and mental health needs, ultimately leading to her death.

224.    For example, at approximately 3:00 a.m. on December 25, 2022, Turn Key nurse Irene Muriuki, LPN, observed Ms. Bradley in her cell. Ms. Bradley was unresponsive to verbal stimuli, and Nurse Muriuki had to physically touch/shake Ms. Bradley to get her to respond. Ms. Bradley was eventually able to say "stop" to Nurse Muriuki. Despite barely being able to rouse Ms. Bradley, who was still suffering from obviously emergent medical and mental health conditions, Nurse Muriuki left the cell and continued with her shift. In deliberate indifference to Ms. Bradley's serious medical needs, Nurse Muriuki failed to refer Ms. Bradley to a physician or mid-level provider and failed to send her to an offsite hospital for an emergent evaluation.

225.    In each of these instances, there was an utter lack of physician supervision over the clinical care provided to the inmates.  And each of these inmates, with obvious, serious and emergent medical and mental health conditions, was kept at the jail when they clearly should have been transported to a hospital or other off-site provider capable of assessing and treating the conditions.

226.    By its design, the Turn Key medical system was destined to fail.

227.    At all pertinent times, Dr. William Cooper, D.O., was the "Medical Director" for Turn Key.  In an effort to cut costs, Turn Key and Dr. Cooper spread the few physicians and mid-

level providers they employ far too thin, making it impossible for them to medically supervise, let alone provide appropriate on-site medical care, at any of the county jails under contract with Turn Key.

228.    In essence, Turn Key employs a small number of mid-level providers, such as physician's assistants or nurse practitioners, and physicians who travel all over the State (and sometimes to other states, such as Arkansas and Kansas) to numerous county jails for short blocks of time. Often, the small number of mid-level providers must conduct most, if not all, of their "assessments" of inmates remotely, without ever seeing, assessing, or treating the inmate in person. This constitutes plainly insufficient medical staffing.

229.    With no physician reasonably available to medically supervise the care provided to the inmates, undertrained personnel were left to practice outside the scope of their training and licensure.

230.    In other words, Turn Key had a policy, practice or custom of inadequately staffing county jails, including the McCurtain County Jail, with undertrained and underqualified medical personnel who are ill-equipped to evaluate, assess, supervise, monitor or treat inmates, like Mr. Wimbley, with complex and serious medical and mental health needs.

231.    With wholly inadequate physician oversight of the clinical care, the non-physician staff was improperly, and dangerously, expected to act in the role of a physician, with the understanding that off-site care was to be avoided.

232.    This system, designed to minimize costs at the expense of inmate care, obviously placed inmates with complex, serious and life-threatening medical and mental health conditions, like Mr. Wimbley, at substantial risk of harm.

233.    This system, which Turn Key implemented company-wide, was substantially certain to, and did, result in constitutional deprivations.

34

234.    MCJT and the County/BOCC were on notice that the medical care and supervision provided by Turn Key and the detention staff was wholly inadequate and placed inmates like Mr. Wimbley at excessive risk of harm.  However, MCJT and the BOCC/County failed to alleviate the known and obvious risks in deliberate indifference to the rights of inmates like Mr. Wimbley.

235.    Moreover, Dr. Cooper, Turn Key's Medical Director, has maintained a policy, at the corporate level, of intentionally omitting information about inmates' negative health outcomes from written documentation, and has ordered Turn Key personnel to keep such bad news out of written communications.

236.    This policy, in and of itself, constitutes deliberate indifference to the health and safety of Turn Key's patients.

237.    Turn Key has maintained a custom of inadequate medical care and staffing at a corporate level which poses excessive risks to the health and safety of inmates like Mr. Wimbley.

<u>**CAUSES OF ACTION**</u>

**VIOLATION OF THE EIGHTH AND/OR FOURTEETH
AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
(42 U.S.C. § 1983)**

238.    Paragraphs 1-237 are incorporated herein by reference.

**A.    Individual Liability and Underlying Violation of Constitutional Rights**

- **Failure to Provide Adequate Medical Care**

239.    Mr. Wimbley had obvious, severe, and emergent medical and mental health needs made known to MCJT/the County and Turn Key.

240.    Indeed, as described, *supra*, Mr. Wimbley reported his obviously severe symptoms on a daily basis to Jail staff and Turn Key staff alike.

241.     Nonetheless, MCJT/the County and Turn Key staff disregarded the known and obvious risks to Mr. Wimbley's health and safety.

242.     As described *supra*, Mr. Wimbley had serious and emergent medical issues that were known and obvious to the Turn Key/MCJT/BOCC employees/agents. It was obvious that Mr. Wimbley needed immediate and emergent evaluation and treatment from a physician, but such services were denied, delayed, and obstructed. Turn Key/MCJT/BOCC employees/agents disregarded the known, obvious, and substantial risks to Mr. Wimbley' health and safety.

243.     In deliberate indifference to his serious medical needs, health, and safety, Defendants failed to provide Mr. Wimbley with, *inter alia*, timely or adequate medical treatment; proper monitoring and supervision; or reasonable access to outside medical providers who were qualified and capable of evaluating and treating him while he was placed under their care.

244.     As a direct proximate result of the unlawful conduct of Jail and Turn Key staff, Mr. Wimbley suffered actual and severe physical injuries, physical pain and suffering, emotional and mental distress, and medical expenses.

## B.  Municipal Liability (**Against Turn Key**)

245.     Paragraphs 1-244 are incorporated herein by reference.

246.     Turn Key is a "person" for purposes of 42 U.S.C. § 1983.

247.     At all times pertinent hereto, Turn Key was acting under color of State law.

248.     Turn Key has been endowed by McCurtain County with powers or functions governmental in nature, such that Turn Key became an instrumentality of the State and subject to its constitutional limitations.

249.     Turn Key is charged with implementing and assisting in developing the policies of MCJT with respect to the medical and mental health care of inmates at the McCurtain County Jail and has shared responsibility to adequately train and supervise its employees.

250.    In addition, Turn Key implements, maintains and imposes its own corporate policies, practices, protocols and customs at the Jail.

251.    There is an affirmative causal link between the aforementioned acts and/or omissions of Turn Key medical staff, as described above, in being deliberately indifferent to Mr. Wimbley' serious medical needs, health, and safety, and the above-described customs, policies, and/or practices carried out by Turn Key.

252.    To the extent that no single officer or professional violated Mr. Wimbley's constitutional rights, Turn Key is still liable under a theory of a systemic failure of policies and procedures as described herein. There were such gross deficiencies in medical procedures, staffing and facilities and procedures that Mr. Wimbley was effectively denied constitutional conditions of confinement.

253.    Turn Key knew or should have known, either through actual or constructive knowledge, or it was obvious, that these policies, practices and/or customs posed substantial risks to the health and safety of inmates like Mr. Wimbley.  Nevertheless, Turn Key failed to take reasonable steps to alleviate those risks, in deliberate indifference to inmates', including Mr. Wimbley's, serious medical needs.

254.    Turn Key tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein.

255.    Additionally, Turn Key has maintained a healthcare delivery system at a corporate level, including at the McCurtain County Jail, that has "such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Garcia v. Salt Lake County,* 768 F.2d 303, 308 (10th Cir. 1985).

256.    There is an affirmative causal link between the aforementioned customs, policies, and/or practices and Plaintiff's injuries and damages as alleged herein.

### C. Municipal Liability (Against BOCC and MCJT)

257.    Paragraphs 1-256 are incorporated herein by reference.

258.    The aforementioned acts and/or omissions of MCJT and/or Turn Key staff in being deliberately indifferent to Mr. Wimbley's health and safety and violating Mr. Wimbley's civil rights are causally connected with customs, practices, and policies which the MCJT/County/BOCC promulgated, created, implemented and/or possessed responsibility for.

259.    Such policies, customs and/or practices are specifically set forth *supra.*

260.    The MCJT/County/BOCC, through its continued encouragement, ratification, approval and/or maintenance of the aforementioned policies, customs, and/or practices; in spite of their known and obvious inadequacies and dangers; has been deliberately indifferent to inmates', including Mr. Wimbley', health and safety.

261.    The MCJT/County/BOCC has maintained a healthcare delivery system at the Jail that has such "gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Garcia v. Salt Lake County,* 768 F.2d 303, 308 (10th Cir. 1985).

262.    As a direct and proximate result of the aforementioned customs, policies, and/or practices, Mr. Wimbley suffered injuries and damages as alleged herein.

263.    As a direct and proximate result of Defendants' conduct, Plaintiff is entitled to pecuniary and compensatory damages.

### **PRAYER FOR RELIEF**

WHEREFORE, based on the foregoing, Plaintiff prays this Court grant him the relief sought, including but not limited to actual and compensatory in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit,  punitive damages for Defendant Turn Key and its employees' reckless disregard of Mr. Wimbley' rights, the costs of

bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

/s/Daniel E. Smolen
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Bryon D. Helm, OBA #33003
SMOLEN & ROYTMAN
701 South Cincinnati Avenue
Tulsa, Oklahoma 74119
P: (918) 585-2667
F: (918) 585-2669

**Attorneys for Plaintiff**